JiSCHOTT, Chief Judge.
This case arose out of an automobile accident in which the plaintiffs were injured as a result of the negligence of defendant, Glen E. Harrison. The trial court rendered judgments in favor of Dawn Carter for $28,580, Dustin Carter for $250, and Bernadine De-Roche for $156,426 against Harrison and his liability insurer, Generali U.S. Branch. The Generali policy contained limits of $20,000 for the accident, but the trial court held that it acted in bad faith toward its insured exposing it to the excess judgments in favor of plaintiffs. The issues on appeal are whether the excess judgments are supported by the law or the facts of this case and whether the awards for general damages are excessive.
The accident which occurred on January 3, 1992, involved three vehicles. The lead vehicle occupied by Gaynell and Anika Sullivan, and the second vehicle occupied by plaintiffs were stopped when the third vehicle, driven by defendant Harrison, struck plaintiffs’ vehicle propelling it into the Sullivan vehicle. The Sullivans, like the plaintiffs, sustained injuries and filed suits against Harrison and Generali.
Generali’s policy was limited to $10,000 for each claimant and an aggregate of $20,000 for each accident. In July 1993, it proposed to settle all the claims on the basis of $4,500 for each of the Sullivans and thé remaining 12$11,000 for plaintiffs. The Sullivans settled, but the plaintiffs would not. Generali through its counsel kept its insured, Harrison, informed of these developments and advised him of his potential liability in the event plaintiffs would not settle. When all efforts to settle with plaintiffs failed, Generali provoked a concursus proceeding against them on February 4, 1994, depositing the remaining $11,000 plus interest and costs into the registry of the trial court. Genera-li’s policy contained the following pertinent provisions:
... Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for “bodily injury” or property damage not covered under this policy.
Pursuant to these provisions Generali’s counsel filed motions to withdraw as attorney for Harrison, but the trial court denied these motions.
After a bench trial in January 1995, the trial court'made awards in general damages to Dawn Carter for $25,000 and to Bernadine DeRoche for $150,000. He cast Generali for the full amounts of these awards along with Harrison. In reasons for judgment the trial court found that General did not act in good faith and violated its fiduciary duty toward its insured by making the settlements with the Sullivans instead of convoking a concur-sus proceeding involving the full policy limits against all of the claimants. As legal authority for the judgment against Generali the court cited LSA-R.S. 22:1220 and Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988), in the context of the duty owed by an insurer to its insured.
We first consider the merits of the excess judgment against Generali. First, on the facts the record does not support the trial court’s conclusion that Generali failed to act in good faith. The policy provision quoted above is identical to the one at issue in Pareti, supra, and which the court found to be Igvalid. In discussing the situation in the present case where the insurer is confronted with multiple claims which exceed the policy limits, the court charged the insurer with the duty of acting in good faith and due regard for the insured’s best interest in settling one or more claims. The court noted that an insurer would not act in good faith if it “hastily enters a questionable settlement simply to avoid further defense obligations under the policy.” In that instance the court held that an insurer “may be held liable for damages caused to its insured.” Pareti at *548 page 423. In Pareti it was the insured who was seeking damages against his insurer. In the present case the insured is not a party. Pareti provides no authority for a judgment in favor of third party claimants like the plaintiffs in this case even if the settlement made with the Sullivans had been “hastily entered” and “questionable” as discussed in Pareti.
In Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La.1977), the court originally overruled its previous decision in Richard v. Southern Farm Bureau Casualty Insurance Co., 254 La. 429, 223 So.2d 858 (1969). In Richard the court held 223 So.2d at page 861:
... where there are multiple claims arising out of an accident, the liability insurer, in entering compromise settlements pursuant to the right accorded it under the provisions of the policy, may exhaust the entire fund and thus one or more of the injured parties may find that they have little or no recourse against such insurer....
However, on rehearing in Holtzclaw the court reversed itself and fully reinstated its holding in Richard. Holtzclaw at page 1287. In Pareti, supra, at page 423, the court cited Holtzclaw for the. proposition that “[w]hen multiple claims are filed against the insured that have the potential for exceeding the insurer’s policy limits, the insurer must act in good faith and with due regard for the insured’s best interest in considering whether to settle one or more claims.”
Lin the present case Generali was faced with claims and lawsuits by five different persons. The aggregate of the claims clearly exceeded the policy limits. Not until eighteen months after the accident did Generali propose these settlements which included $9,000 for the Sullivans and $11,000 for the plaintiffs. When the Sullivans agreed to settle, Generali was able to eliminate its insured’s exposure for two of the five claims pending against him. In July 1993, Generali sent a letter to plaintiffs’ attorney offering to settle. This letter was substantially the same as the one sent to the claimant in Holtzclaw. Holtzclaw ignored the letter, and the insurer settled with the other claimants. In that case the court found that there was not sufficient evidence to support a finding that the insurer acted unreasonably or without good faith with respect to Holtzclaw. In the present case plaintiffs’ conduct was much the same. We have concluded that the trial court’s finding that Generali did not act in good faith is manifestly erroneous. The judgment against Generali is to be reversed.
Next, we consider whether the trial court abused its discretion with respect to the awards for general damages to Dawn Carter and Bernadine DeRoehe.
Carter saw Dr. Diaz on January 10, 1992. She stated her knee struck the dashboard in the accident, and she complained of knee, neck, back and wrist pains and headaches. After a physical examination Dr. Diaz diagnosed cervical and lumbar strain, tendonitis of the right knee, and a shoulder contusion. By the end of February all of these problems were resolving except the knee, and an MRI was done on the knee. This was normal except for fluid on the knee which is usually related to some type of irritation or trauma. Dr. Diaz continued to treat Carter until September 23, 1992, and she continued to have tenderness, popping, and giving out of the knee on occasion. He recommended arthros-copy for Carter, but she stated that she could not afford to have it done. | gDiaz testified that without the arthroscopy he could not provide a disability rating for her, and he did not know the full extent of her injury. He thought she sustained at least a sprain, but there “may be more to it than that.”
Carter testified that she still has some trouble with her knee at trial time in-1995. However, Dr. Diaz testified that she came to him several times in 1993 with shoulder problems that were not related to the accident in question here, and she made no complaints about her knee. In any event she was never hospitalized; she never had a brace or used crutches; her activities were never restricted, and she had no loss of earnings or earning capacity. Dr. Diaz who had the benefit of her complaints would not characterize her problem as anything more than a sprain and “maybe some minor problems with the knee popping.”
DeRoehe also saw Dr. Diaz on January 10, 1992, complaining of neck and back pain *549 since the accident a week before. Examination included X-rays of the neck and lower back which revealed degenerative arthritis in both areas of the spine, cervical disc disease with some narrowing at C5-6, and lumbar disc disease at L5-S1. He diagnosed a cervical and lumbar sprain, superimposed or preexisting disc disease and arthritis. Following arm pain complaints in February, Dr. Diaz had an MRI done on her spine. This showed herniations at C8-4 and C4-5 and advanced disc degeneration with some bulging at C5-6. The MRI also showed disc degeneration along the entire aspect of. the lumbar spine from L1-S5 with a broad based herniation of the lumbosacral disc causing some impingement of the epidural fat. Dr. Diaz continued to see plaintiff over the next several months during which she continued to have a lot of pain. She was having more radicular pain even until November 1992 when he last saw her. He did not discharge her, but she said transportation to his office made it necessary for her to stay away.
IsAt this point Dr. Diaz gave her a ten to fifteen percent total body impairment secondary to the ruptured cervical disc. He recommended that she limit herself to sedentary work where she would not be lifting more than ten pounds. He related all of her injuries to the accident of January 3. He thought she was a good candidate for surgery, but she wouldn’t consider it because she was afraid of it. Dr. Diaz was aware of the fact that DeRoche had been previously treated in 1991 by Dr. Olsen after she fell down in a shopping center.
Dr. John Olson, a neurologist, saw De-Roche on August 20, 1992. Her complaints of severe neck pain and other signs suggested C5-6 herniation with nerve root involvement. An EMG performed on September 16 indicated C6 nerve damage. She continued with considerable discomfort until the end of 1992 when she last saw him. His prognosis was continuing neck pain, nerve root dysfunction in her right arm, and continuing weakness. He thought that she had some problems before the January 3, 1992 accident, but he related her cervical nerve root injury to that accident and not the earlier fall.
Dr. Olson testified that following her previous accident, the fall she had in 1990, X-ray studies showed degenerative changes and a mild scoliosis in the lumbar spine and rather advanced localized degenerative changes at C5-6 with lesser changes at C4-5. He last saw her for the slip and fall injury in May 1991. At this time she was still symptomatic, and he recommended an MRI. He thought she was disabled at that time to the extent she should have restricted herself to a sedentary job.
DeRoche testified she was feeling fine after May 1991. At trial time she stated she was having constant pain in her neck and back since the accident, non-stop headaches for three months, numbness and stiffness in her hands.
In his reasons for judgment the trial court found that DeRoehe’s injuries frwere more likely than not the result of the automobile accident. These injuries consisted of two herniations in the neck and one in her back. He noted Dr. Diaz’s belief that she was a candidate for surgery and Dr. Olson’s testimony that she is living with a good deal of functional difficulty.
While the record supports the trial court’s conclusion that the accident caused De-Roehe’s herniations, the fact remains that she was disabled to some extent before the accident. When Dr. Olson saw her eight months before the accident, her problems were serious enough for him to recommend, an MRI. These problems were in the very area where Dr. Diaz’s MRI disclosed the cervical disc herniations. The disability ratings and recommendations given by Olson in May 1991 were similar to those given by Diaz in August 1992. He was restricted to sedentary activities and told to avoid lifting more than ten pounds. DeRoche’s testimony that she was feeling fine after May 1991 is flatly contradicted by that of Dr. Olson who was her own treating physician. DeRoche was never hospitalized; she had no loss of earnings, and did not undergo extensive treatment. While the tort feasor takes his victim as he finds her, many of her problems were pre-existing.
*550 The awards to Carter and DeRoche were quite generous. However, in the light of Youn v. Maritime Overseas Corp., 623 So.2d 1257 (1993), which severely constricts our authority to correct such awards they are affirmed.
Accordingly, the judgments against Gener-ali-U.S. Branch, designated as Graward General Insurance Company in the judgment are reversed and set aside.
The judgments in favor of Dawn Carter and Bernadine DeRoche against Glenn E. Harrison are affirmed.
■ The amount deposited in the registry of the court by Generali is to be divided among Dawn Carter, Dustin Carter, and Bernadine DeRoche in ^proportion to the amounts of the final judgments they obtain against Harrison.

REVERSED IN PART; AFFIRMED IN PART.